**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (AKRON)**

**DR. STACEY D. HODOH**
1303 Hardesty Boulevard
Akron, Ohio 44320

Plaintiff,

v.

**BOARD OF EDUCATION OF THE AKRON CITY SCHOOL DISTRICT**
(Akron Public Schools)
10 North Main Street
Akron, Ohio 44308

and

**MARY B. OUTLEY**
individually,
c/o Akron Public Schools
10 North Main Street
Akron, Ohio 44308

Defendants.

Case No. 5:26 CV 2974

Judge JUDGE LIOI

Magistrate Judge MAG JUDGE KNAPP

**COMPLAINT FOR EMPLOYMENT DISCRIMINATION, HARASSMENT, RETALIATION, AND DEFAMATION**

(Title VII, 42 U.S.C. § 2000e *et seq.*;
ADEA, 29 U.S.C. § 621 *et seq.*;
42 U.S.C. § 1983; Ohio law)

**JURY TRIAL DEMANDED**

FILED
NOV 1 2 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

Receipt number 10519

Plaintiff Dr. Stacey D. Hodoh, for her Complaint against Defendants Board of Education of the Akron City School District and Mary B. Outley, states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 626(c), because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); and 42 U.S.C. § 1983.

2. Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the events occurred in Summit County, and assignment to the Akron courthouse is proper under Local Civil Rule 3.8.

3. The Court has supplemental jurisdiction over the Ohio-law claims under 28 U.S.C. § 1367(a).

## INTRODUCTION

4. Dr. Stacey D. Hodoh, a Black woman and a seasoned executive, ran two executive departments at Akron Public Schools for ten months and was paid for one. White male administrators who took on extra duties were paid by Board resolution. Her written request for the same treatment was never answered.

5. Two weeks into her job, a Board member told her to stay in her place, then confronted her in an elevator. She filed a charge of discrimination. From then on, each time she used the civil-rights process, the District took something away, until, five days after she told the Board in writing that she was being retaliated against, it walked her out of the building. Twelve days later, it told the EEOC she had suffered no adverse employment action.

6. Dr. Hodoh sues the District under Title VII, the ADEA, and the Ohio Civil Rights Act, R.C. Chapter 4112, and sues Superintendent Mary B. Outley personally under 42 U.S.C. § 1983 and for defamation.

## PARTIES

7. Plaintiff **Dr. Stacey D. Hodoh** resides at 1303 Hardesty Boulevard, Akron, Ohio 44320, in Summit County. She is a Black woman. She is over forty years of age and was fifty-nine when she filed her amended charge. She has been employed by the District since December 9, 2024 as Director of Strategic Communications, Media, Community Relations and Outreach, and from February 2025 through December 2025 she also served as Interim Executive Director of Information Technology. She is an "employee" under 42 U.S.C. § 2000e(f) and 29 U.S.C. § 630(f).

8. Defendant **Board of Education of the Akron City School District**, which operates Akron Public Schools (the "District" or "APS"), is a body politic and corporate capable of suing and being sued under R.C. 3313.17, with its principal office at 10 North Main Street, Akron, Ohio 44308. It employs well over 500 people and is an "employer" under 42 U.S.C. § 2000e(b) and 29 U.S.C. § 630(b). It acts through its Board members, Superintendent, and administrators, acting within the scope of their authority.

9. Defendant **Mary B. Outley** has been Superintendent of the District since April 2025 (Interim Superintendent from April 15, 2025). She made the decision to place Dr. Hodoh on administrative leave. She is sued in her individual capacity. At all relevant times she acted under color of state law. Her business address is 10 North Main Street, Akron, Ohio 44308.

## ADMINISTRATIVE EXHAUSTION

10. On December 26, 2024, Dr. Hodoh filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC"), Charge No. AKR73(011675)12262024, dual-filed with the U.S. Equal Employment Opportunity Commission ("EEOC"). The charge identified the bases of discrimination as **Race (Black/African American), Sex (Female), and Retaliation**, and the harms as **Harassment** and **Other (bullying, hostile work environment)**. A copy is attached as **Exhibit A**. The District acknowledges receiving it on April 15, 2025. The EEOC later assumed processing of the charge as EEOC Charge No. 22A-2025-01399.

11. On January 14, 2026, Dr. Hodoh amended her charge to add further retaliation and the District's refusal to pay her for her second executive role while paying white male administrators, one substantially younger, for comparable duties, and to add age (40 and over) as a basis. She resubmitted the amendment through the EEOC portal on March 6, 2026 and in signed form in April 2026. The District acknowledges receiving it on April 20, 2026.

12. On April 28, 2026, she submitted a second amendment alleging further retaliation and harassment, and in May and June 2026 she placed the administrative leave described below before the EEOC in writing.

13. On August 13, 2026, the EEOC issued a Determination and Notice of Rights advising Dr. Hodoh of her right to sue. She received it the same day through the EEOC portal. A copy is attached as **Exhibit B**. This Complaint is filed within ninety days of receipt.

14. Each claim rests on the charge as amended or on retaliation growing out of it, which need not be separately charged. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998); 29 C.F.R. § 1601.12(b). Each paycheck issued without the compensation is a

separate violation. 42 U.S.C. § 2000e-5(e)(3)(A); 29 U.S.C. § 626(d)(3). More than sixty days passed between the age charge and this action. 29 U.S.C. § 626(d)(1).

15. All conditions precedent to this action have been satisfied. The claims under 42 U.S.C. § 1983 and Ohio law require no administrative charge.

## FACTS

### A. A proven executive comes home

16. Dr. Hodoh has been a global executive in the private sector for more than twenty years, including in senior leadership roles at Google and Walmart. She holds a doctorate. In 2024, she moved home to Akron to care for her parents and applied for an open position at APS.

17. Dr. Hodoh began work at APS on December 9, 2024 as Director of Strategic Communications, Media, Community Relations and Outreach: the District's chief spokesperson and a member of its senior leadership team, reporting to the Superintendent.

18. On February 10, 2025, the District publicly announced that Dr. Hodoh would also serve as Interim Executive Director of Information Technology, citing her record as a global executive in high technology. She held both roles until December 2025.

19. Dr. Hodoh has never received a performance evaluation at APS, although District policy requires one. The District has never contended that she failed to perform either role. Her contract renewed for one year effective July 1, 2026.

### B. December 2024: Stay in her place

20. In her first week on the job, Dr. Hodoh raised concerns in writing with the Board President and the Superintendent about Board Member Gregory Harrison's conduct, including his disclosure of confidential personnel information.

21. On or about December 17, 2024, then-Superintendent Dr. Michael Robinson relayed to Dr. Hodoh a directive from Board Member Harrison: that she stop communicating with Board members and the Board's attorney, and that she stay in her place.

22. That morning, Dr. Hodoh wrote to Board Member Harrison objecting to the directive and asking him to stop bullying her. Four minutes later he replied that he had taken his

concerns directly to the Superintendent and told her not to email him again. He did not deny the directive.

23. Board Member Harrison, a man with power over Dr. Hodoh's employment, directed a Black woman executive to stay in her place, a command with a long history as a demand that Black women, and women generally, defer and be silent.

24. On the evening of December 18, 2024 (December 19 on the OCRC intake form), after a public Board meeting, Board Member Harrison entered an elevator with Dr. Hodoh and three other Board members, including Dr. Carla Jackson, who later served as Board President. Board Member Harrison, approximately six feet two inches tall and 240 pounds, turned toward Dr. Hodoh, closed to within inches of her while her back was against the wall, stared at her, and repeatedly demanded to know who she was. Other Board members, all women, stepped between them as the doors opened.

25. The question, asked one day after he ordered her to stay in her place, meant: who do you think you are? Dr. Hodoh experienced the encounter as menacing and physically threatening.

26. Board Member Harrison knew who Dr. Hodoh was. The Board approved her hiring on November 25, 2024; she was introduced at the December 9 Board meeting, which he attended; and he had answered her email the day before. Upon information and belief, before she joined the District he had reviewed her résumé and told members of her family she should take a chief-of-staff role instead.

27. Upon information and belief, Board Members Harrison and Molenaur later reported that Dr. Hodoh told Board Member Harrison he would find himself on a poster. Dr. Hodoh was referring to being posterized, a common basketball expression for being outdone in public. It was not a threat.

28. Dr. Hodoh reported Board Member Harrison's conduct in writing to the Board President on December 18, 2024, and reported the elevator encounter on December 20, 2024 as

retaliation, bullying, and menacing behavior. The District did not acknowledge, investigate, or explain it at the time.

29. When the District answered Dr. Hodoh's charge, it relied on accounts from Board Members Harrison and Molenaur and also collected one from Board Member Barbara Sykes, now Board President. Of the four Board members in the elevator, the only one the District never interviewed was Dr. Jackson, who, upon information and belief, has stated that her account of what took place differed from Board Member Harrison's.

30. Upon information and belief, Board Member Molenaur's report, written on or after December 29, 2024, acknowledged that she had not recognized Dr. Hodoh, yet asked that Dr. Hodoh be added to the outside investigation of the Superintendent, that her fitness for her role be assessed, and that her presence around Board members be limited. The Harrison and Molenaur complaints were published in the local press in January 2025.

31. Board Member Molenaur's report recommended reviewing the security footage. There is none from inside the elevator. The ground-floor footage, later posted online and without audio, shows the Board members exiting toward the boardroom and Dr. Hodoh exiting last, with Board Member Sykes beside her, heading the other way to her car, where a security officer walked her. Nothing in it corroborates Board Member Harrison's account.

32. Complaints by white male administrators were handled differently. In the fall of 2024, the Board received complaints about then-Superintendent Robinson from Steven Keenan, a white man, and, upon information and belief, from Dr. Hodoh's predecessor, Mark Williamson, and Michael Defibaugh, both white men. The Board retained an outside law firm, whose April 11, 2025 report substantiated those complaints and corroborated Robinson's mistreatment of the former Director of Communications. The same report treated Dr. Hodoh's allegations about Board Member Harrison as outside its scope.

33. On December 26, 2024, Dr. Hodoh filed her charge of race discrimination, sex discrimination, harassment, and retaliation with the OCRC. On February 3, 2025, she told Superintendent Robinson that she had done so.

34. The Board-member scrutiny continued after the charge. On April 9, 2025, Dr. Hodoh wrote to the Board documenting targeting by certain Board members since the elevator incident, including interference in her department's media decisions, a demand for supervisory action against her, and Board Member Molenaur's false accusation that she had acted as an intermediary for the Superintendent's personal attorney. She asked them to cease and desist.

35. Two days later, a Signal Akron reporter asked Dr. Hodoh to comment on that email, framing his questions around Board Member Molenaur's accusation. Upon information and belief, Board Member Molenaur gave the email to the media to embarrass Dr. Hodoh publicly. The District did nothing.

**C. The investigation the Board's own members would not sit for**

36. In or about April 2025, the District engaged an outside investigator, the Tracy Vroom Agency, to investigate the matter between Dr. Hodoh and Board Member Harrison. Interviews were scheduled for April 22, 2025.

37. Upon information and belief, on April 8, 2025, two weeks before the scheduled interviews, Board Member Molenaur wrote to her fellow Board members that she had understood from prior Board discussions that the investigation was focused on Dr. Hodoh, and objected that the investigator's letter instead referred to an investigation of a Board member.

38. On April 22, 2025, the investigator suspended the investigation because none of the identified witnesses had appeared. Upon information and belief, those witnesses were Board Members Harrison, Molenaur, and Sykes. She cancelled Dr. Hodoh's interview, set for that morning.

39. Upon information and belief, once the matter was framed as Dr. Hodoh's complaint against Board Member Harrison, the Board-member witnesses declined to participate, and Board Member Harrison then asked the District's Executive Director of Human Resources, Chase Canfield, to investigate the matter himself.

40. The District's Anti-Harassment Policy 4362 provides that the Board will investigate all allegations of harassment, including by Board members. The investigation was

never restarted, and Dr. Hodoh's complaint was never decided. Eleven days earlier, the Board had received a completed outside report upholding the complaints of white male administrators.

41. Administrative Guideline 4122-B names two Complaint Coordinators to investigate complaints of discrimination and retaliation. Neither was available to Dr. Hodoh: one had left the District in 2023, and the other, Labor Relations Manager Tod Wammes, later opened an off-duty inquiry into her and left in February 2026 after being placed on administrative leave. In late 2025, Mr. Canfield confirmed in writing that no coordinators were in place.

42. Dr. Hodoh promptly complained in writing to the Board President within days of the directive and the elevator encounter and filed her OCRC charge eight days later. The District, which has told the EEOC that she never filed an internal complaint, cannot fault her for not using a process it had left with no one to run.

**D. Two executive jobs, one paycheck**

43. In 2024 the Board paid **Steven Keenan**, a white man, $9,227.35 in supplemental pay (Job Code 603, Interim Supervisory Assignment) for about eleven weeks as Interim Director of Facility Services.

44. On June 10, 2024, the Board approved extended-time pay of $46.60 per hour for **Thomas Bruno**, a white man and General Manager of the District's radio station, for work outside the regular workday. Mr. Bruno reported to Dr. Hodoh, and for the first several months of her tenure, including when she submitted her own request, her subordinate was paid for extra hours while she was not.

45. On April 3, 2025, Dr. Hodoh asked Superintendent Robinson and Angela Carter, then Chief of Staff and Interim Executive Director of Human Resources, in writing for both kinds of pay, explaining that she was performing the duties of two full-time, high-level positions and that the District had paid others for additional responsibilities.

46. Supplemental and extended pay are awarded by Board resolution on a written recommendation, as the Keenan and Bruno awards were. No recommendation was ever made for

Dr. Hodoh, her request never reached the Board, and no one told her it was denied, or why. That departed from the District's ordinary process.

47. The change in superintendents does not explain the inaction. The Treasurer processes payroll, but salary administration belongs to Human Resources. Ms. Carter, upon information and belief, remained in that role until October 2025, and the District has told the EEOC that Superintendent Outley herself discussed supplemental pay with Dr. Hodoh. Neither acted.

48. Shortly after the request, and before he was placed on leave on April 15, 2025, Superintendent Robinson told Dr. Hodoh that he had not advanced it because she was unpopular with Board Members Harrison, Sykes, and Molenaur. By then she had complained in writing about Board Member Harrison and had told Robinson of her charge.

49. Dr. Hodoh performed both roles until December 2025 and never agreed to perform the second without pay. Her request for the months she had served was never answered.

50. The department she took on had been a full-time, salaried executive position. Her predecessor in it, **Zachary Hanshaw**, a white man, was reappointed by the Board on May 28, 2024 as Executive Director, Data & Accountability (Job Class 111), a department commonly referred to within the District as IT, with annual salary increases. When he left in February 2025, the District gave his department to Dr. Hodoh on top of her own and paid her nothing for it. Mr. Keenan, who is about nineteen years younger than Dr. Hodoh, was paid for eleven weeks of interim work; she was paid nothing for ten months.

51. The District told the EEOC that Dr. Hodoh did not want additional pay and that it never denied it. Her dated written request is in the District's files, and she was never paid.

52. When the OCRC asked for comparable employees, the District said on June 5, 2025 that it had no responsive documentation, although the Keenan and Bruno awards appear in the Board's own published resolutions.

**E. After the charge, the tools disappeared**

53. Mary B. Outley became Interim Superintendent on April 15, 2025 — the day the District acknowledges receiving Dr. Hodoh's charge — and Superintendent on April 28, 2025.

54. On October 8, 2025, Dr. Carla Chapman, a District administrator and Board Member Harrison's close confidant and ally, filed a workplace complaint against Dr. Hodoh citing the elevator incident. On October 30, 2025, Superintendent Outley closed it in writing, finding no indication of any inappropriate conduct by Dr. Hodoh.

55. In the fall of 2025, the District's labor-relations manager, himself a designated EEO Complaint Coordinator, opened an inquiry into an off-duty personal disagreement Dr. Hodoh had at an evening community event. The inquiry concluded that she had not violated District policy.

56. On or before October 28, 2025, the District removed Dr. Hodoh, without notice, from the public-records-request distribution, the system through which its spokesperson learns what the media is asking. On November 15, 2025, she objected in writing to Mr. Canfield that the removal was retaliation for her protected activity.

57. In November 2025, the District declined to give Dr. Hodoh access to BoardDocs, the Board's meeting-materials platform, which about one hundred employees have, including her own secretary. Her February 26, 2026 written request to restore both tools was refused.

58. On February 23, 2026, at Superintendent Outley's direction, Mr. Canfield took Dr. Hodoh's building master key, although her predecessor, Mark Williamson, a white man, held the same access throughout his tenure. The receipt Mr. Canfield signed records that no key audit or key-control policy had been presented to her as the basis.

59. The District has since told the EEOC that the Superintendent decided, based on job descriptions, which administrators should keep master keys. But it had no key records, no key audit, and no key-control policy, and it has identified nothing explaining why Dr. Hodoh's key was selected.

60. The District has described these actions to the EEOC as neutral, systemwide reforms. It has identified no document showing that any of them was planned before it learned of Dr. Hodoh's charge.

**F. Spring 2026: protected activity, and the response to it**

61. On February 24, 2026, Dr. Hodoh wrote to the Treasurer, copying Superintendent Outley and Mr. Canfield, about a subpoena compelling her to testify at the termination hearing of a District employee, Darian Johnson. She wrote that she feared retaliation for her honest testimony, that she was relying on Title VII's participation clause, and that she was forwarding the letter to her EEOC investigator.

62. In early March 2026, Dr. Hodoh overheard her direct subordinate say on a late-evening telephone call, through an open office door, that Board President Sykes and Superintendent Outley were planning to end Dr. Hodoh's contract at the end of the fiscal year, and ask how to raise compensation or support for the added workload.

63. About a week later, between March 18 and March 23, 2026, Mr. Canfield and the HR Benefits Manager held about 180 minutes of meetings with that subordinate about her job description, without informing Dr. Hodoh, her supervisor, and while leaving Dr. Hodoh's own written request for that job description unanswered.

64. Upon information and belief, Superintendent Outley directed those meetings, and their purpose was to prepare the subordinate to take over Dr. Hodoh's duties. On June 2, 2026, after Dr. Hodoh was removed, the District began routing her incoming work email to that same subordinate.

65. On March 23, 2026, Dr. Hodoh complained in writing to Superintendent Outley that the meetings were retaliation for her protected activity, citing both Title VII and Ohio's whistleblower statute, and asked that they stop and that records be preserved for her pending EEOC charge.

66. On March 27, 2026, Dr. Hodoh testified under subpoena at Mr. Johnson's termination hearing. Mr. Johnson is a Black man whose hostile-work-environment complaints an

outside investigator had substantiated in May 2025. Dr. Hodoh testified in his support, including that she had seen the Executive Director of Business Affairs, Debra Foulk, yelling at him.

67. Mr. Canfield attended the hearing. Before her examination began, with Mr. Canfield in the room, Dr. Hodoh stated on the record that Mr. Canfield was one of the persons who had targeted her. She asked twice, on the record, for an assurance from the District that she would not be retaliated against for testifying.

68. On April 20, 2026, the District received Dr. Hodoh's amended EEOC charge.

69. On April 28, 2026, Superintendent Outley rejected Dr. Hodoh's March 23 complaint and warned Dr. Hodoh, the employee who had complained of retaliation, not to retaliate against the subordinate. She added that outside employment counsel would join their next one-on-one meeting.

70. The Superintendent decided the complaint without interviewing Dr. Hodoh, although the meetings had taken place at her own direction. Administrative Guideline 4122-B assigns such investigations to impartial Complaint Coordinators, none of whom was in place. The Superintendent thus investigated and decided a complaint about her own conduct.

71. On Sunday, May 3, 2026, Dr. Hodoh sent every Board member, the General Counsel, and the District's outside counsel at Roetzel & Andress, LPA a written notice reporting that she was being retaliated against for her protected activity, including her testimony; that Human Resources had met with her staff behind her back; that no EEO Complaint Coordinators were in place; and that the Superintendent had decided a complaint about her own conduct. It asked for an independent investigator and stated that she was preserving her remedies before the EEOC.

72. On May 4, 2026, she wrote to the hearing referee in Mr. Johnson's case, copying the General Counsel, that she had been targeted twice since testifying and had amended her EEOC charge.

**G. May 8, 2026: removed from the workplace**

73. Upon information and belief, within days of the May 3 notice Superintendent Outley telephoned Ms. Carter, referred to Dr. Hodoh's weekend emails to the Board accusing the Superintendent of bullying, and asked Ms. Carter to write a statement about a conversation with Dr. Hodoh a month earlier. Upon information and belief, Ms. Carter wrote that statement on May 7, 2026.

74. On May 8, 2026, with less than twenty minutes' notice, Dr. Hodoh was summoned to a mandatory meeting with Mr. Canfield and an outside attorney for the District. Mr. Canfield handed her a letter signed by Superintendent Outley placing her on administrative leave effective immediately.

75. The letter bars Dr. Hodoh from District property and events and from contact with administrators, staff, students, families, or vendors, and required her to surrender her badge, keys, devices, and parking permit. It gave no specific reason, and Mr. Canfield declined to give any.

76. The next morning, Dr. Hodoh emailed Mr. Canfield a summary of the meeting recording her understanding, which she wrote that he had confirmed, that there was a direct connection between the District's review and the protected disclosures she had recently made. Mr. Canfield never responded to correct it.

77. Dr. Hodoh was escorted from the building, and her network account was locked that afternoon. Beginning June 2, 2026, the District routed her incoming work email to the subordinate with whom Mr. Canfield had met in March.

78. Mr. Canfield, who executed the leave, was a named subject of Dr. Hodoh's retaliation complaints and the person she had identified on a sworn record six weeks earlier as having targeted her. He told her the leave was approved by Superintendent Outley with Board President Sykes's approval.

79. The leave came 42 days after Dr. Hodoh's testimony, 18 days after the District received her amended EEOC charge, about ten days after her second amendment, and 5 days after her May 3 notice to the Board.

80. Within five days, the leave was reported in the local press. Board President Sykes confirmed it publicly, and the coverage repeated the leave letter's reference to escalating conduct alongside the Board members' unadjudicated December 2024 accusations against Dr. Hodoh.

81. Since May 8, 2026, the District has denied Dr. Hodoh access to its benefits portal and her own paystubs and has excluded her from administrator training, employee newsletters, and District school and public events.

82. The letter promised a later meeting to present the information gathered and give Dr. Hodoh a chance to respond. None has been offered. She has now been on what the District calls temporary leave for six months.

83. The only request to meet came on or about May 20, 2026, from the District's outside investigator, a lawyer at the firm defending the District against her pending EEOC charge. Dr. Hodoh declined to be interviewed by her adversary's litigation counsel in an investigation running parallel to the EEOC's, which appeared designed to justify a decision already made.

84. On May 26, 2026, eighteen days after it removed Dr. Hodoh, the Board terminated the employment of Mr. Johnson, the employee for whom she had testified.

85. Being barred from one's workplace and staff and escorted from the building well might dissuade a reasonable worker from making or supporting a charge, even if the leave is paid. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

**H. The justification, built after the fact**

86. Upon information and belief, the District's stated basis for the leave rests on two accounts, both dating to on or about April 7, 2026: Ms. Carter's account of a conversation in Dr. Hodoh's office, and Ms. Foulk's account of an exchange in a school parking lot.

87. Upon information and belief, Ms. Carter told Superintendent Outley about the conversation within a day or two after it took place, on or about April 8 or 9, 2026. The Superintendent therefore knew of the very account she later relied on by early April.

88. Yet for nearly a month the Superintendent asked for no statement, opened no investigation, and took no action, while Dr. Hodoh kept working. Only after the May 3 notice did she ask Ms. Carter to put the month-old account in writing. What changed in between was Dr. Hodoh's complaint to the Board.

89. Dr. Hodoh denies threatening anyone. Upon information and belief, no contemporaneous record of any statement attributed to her exists: no email, memorandum, note, or recording.

90. On April 7, 2026, at Ms. Carter's request, Dr. Hodoh met Ms. Foulk at Pfeiffer Elementary School, which had been damaged by roof leaks, to assess the cause.

91. Ms. Carter's contacts with Dr. Hodoh after April 7 were cordial. She spoke with Dr. Hodoh for about thirty minutes that afternoon, called her on April 9, and texted her on April 20, 22, 24, and 28, including, nine days before writing her statement, a parent's post about a school lockdown for her attention as spokesperson. Those are not the contacts of someone who believed Dr. Hodoh had threatened her colleagues.

92. Ms. Foulk had attributed the damage at Pfeiffer and Essex CLC to heavy rain. Dr. Hodoh told her the cause was the District's failure to act on its roofing consultant's recommendations and on the capital improvement plan Dr. Hodoh had prepared, as she had already reported to the Superintendent in writing on April 2, 2026.

93. Dr. Hodoh told Ms. Foulk that if she, Mr. Canfield, and the Superintendent kept the true cause from the Board, she would report it herself. Upon information and belief, Ms. Foulk's own account confirms that Dr. Hodoh said she would hold Ms. Foulk and Mr. Canfield accountable. That is not a threat; it is a statement that she would take a problem to the governing body.

94. On May 6, 2026, Dr. Hodoh reported in writing to the Superintendent and every Board member that the damage was caused by deferred maintenance, not heavy rain. No one responded.

95. Upon information and belief, Ms. Foulk did not report the exchange at the time, told the Superintendent that it did not bother her and that she was not formally reporting it, acknowledged that she was unsure then whether she took it as a threat, and does not believe Dr. Hodoh would harm her. Upon information and belief, she first suggested that the exchange could have been threatening on or about May 28, 2026, three weeks after Dr. Hodoh was removed and after Dr. Hodoh had told the Board that Ms. Foulk's explanation was false. Ms. Foulk was also a subject of Dr. Hodoh's sworn testimony eleven days before the exchange.

96. The conversation Ms. Carter described was one she initiated, and its subject was a complaint. Dr. Hodoh told her that she had raised with Ms. Foulk the disability-related needs of a relative, a District employee whose accommodation request was pending, and that she held Ms. Foulk and Mr. Canfield responsible for how he was being treated. That objection is protected opposition activity. 42 U.S.C. § 12203(a). The District recast it as a threat.

97. Dr. Hodoh told Ms. Carter she intended to report their failure to follow up. She threatened no one, and Ms. Carter's own response, suggesting the relative take his concerns to Human Resources, shows she heard a complaint. Dr. Hodoh had complained to Ms. Carter before about Ms. Foulk's handling of maintenance and her treatment of Mr. Johnson.

98. Ms. Carter was not a neutral witness. She and Superintendent Outley are sorority sisters, a connection both have discussed in administrator meetings. Upon information and belief, they are close friends, both lived in Copley, Ohio during the relevant period, and Ms. Carter is part of the Superintendent's inner circle and a family friend of the relative's father and stepmother. Upon information and belief, she disclosed none of these relationships, and the investigator did not explore them.

99. After removing Dr. Hodoh, the District, upon information and belief at Superintendent Outley's direction, retained Roetzel & Andress, LPA, the same law firm

defending it against her EEOC charge, to investigate her. Upon information and belief, Mr. Canfield served as a principal witness, and the investigation concluded in late July 2026, more than two months after the leave it was conducted to support.

100. The District ran that investigation in parallel with the EEOC's, and while it was under way, on May 20, 2026, told the EEOC that Dr. Hodoh had suffered no adverse employment action.

101. Upon information and belief, the investigator also ruled on Dr. Hodoh's own retaliation complaints, finding no violation of the District's Whistleblower Protection policy (PO 3211) and treating its discrimination complaint procedure (AG 4122) as inapplicable. The firm defending the District against her retaliation charge thus decided that claim in its client's favor, in place of the impartial Complaint Coordinator AG 4122-B requires.

102. Upon information and belief, the investigation also relies on Dr. Hodoh's subordinate, although Superintendent Outley acknowledged that the subordinate raised no issues until after the leave and that they concerned work style, not policy violations.

103. Every prior inquiry into Dr. Hodoh's conduct cleared her, including the October 2025 Chapman complaint and the off-duty inquiry. Every complaint she made was abandoned or rejected. Complaints about her were pursued until one produced a finding, which the District has never presented to her.

104. The District's May 20, 2026 position statement asked the EEOC to find no cause because Dr. Hodoh had suffered no adverse action, without mentioning the leave imposed twelve days earlier, and applied a materially-adverse-change test that the Supreme Court rejected in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).

**I. The retaliation is continuing**

105. As Interim Executive Director of Information Technology, Dr. Hodoh made network security a priority, directing the removal of unnecessary access and the adoption of standardized user profiles. She worked from a Communications-level profile and never held

super-user or endpoint-security administrative access. Control of endpoint security rested with the staff who held that access, not with her.

106. On May 29, 2025, about three months after Dr. Hodoh took on the interim IT role, CDW delivered the District's annual penetration-test report to the District's Network Coordinator, Dan Kirk. Under Dr. Hodoh's supervision, Mr. Kirk corrected many of the findings.

107. In December 2025, oversight of Information Technology passed to Superintendent Outley and Nathan Ruyan, the District's Director of Data and Accountability, and Dr. Hodoh sent Mr. Ruyan a transition email.

108. In early 2026, the State of Ohio assessed the District's technology function, with Mr. Ruyan leading for the District. CDW's 2025 results were revisited as part of that assessment. Upon information and belief, the corrective actions from both the penetration test and the State's assessment were assigned to Mr. Ruyan and Mr. Kirk, under the Superintendent's oversight. For the six months before the June 2026 attack, oversight of Information Technology belonged to Superintendent Outley and Mr. Ruyan, and they and Mr. Kirk were the last officials responsible for correcting any open finding.

109. In June 2026, six months after Dr. Hodoh's IT role ended and while she was on leave and locked out of District systems, the District suffered a cyberattack. Upon information and belief, Superintendent Outley directed that the investigation of the attack be conducted by CDW, the same firm the District had engaged to conduct its 2025 annual penetration test of the District's network.

110. Upon information and belief, Mr. Ruyan is leading the District's work with CDW on the assessment of the attack, as his role requires, and Superintendent Outley and Mr. Canfield are involved in it. Upon information and belief, Mr. Canfield, at the Superintendent's direction, has given District administrators and Technology Department staff updates falsely tying Dr. Hodoh to the attack. CDW's report has not been provided to the Board.

111. That arrangement cannot produce a neutral answer. CDW is evaluating its own work: if the attack exploited a weakness that existed in 2025, its own penetration test did not

catch it, and CDW's published security-services terms state that its services will not detect every security vulnerability, that unauthorized access may occur, and that impenetrable security cannot be attained. The Superintendent oversaw the officials who owned the corrective actions, so the investigation examines a failure on her own watch. Mr. Canfield runs Human Resources, not technology, and helped carry out Dr. Hodoh's removal. CDW, the Superintendent, and Mr. Ruyan share the same motive: each would bear responsibility if the attack exploited a known weakness left uncorrected after December 2025, and blaming an employee locked out of the network since May 8, 2026 serves all three.

112. Upon information and belief, in an executive session of the Board on or about October 5, 2026, before the CDW assessment was complete, Superintendent Outley told the members of the Board that Dr. Hodoh was responsible for the cyberattack and that Dr. Hodoh had been intentionally negligent in managing the District's Information Technology function. Board members who were present heard those statements.

113. Upon information and belief, at Board President Sykes's direction, Superintendent Outley has given Ms. Sykes and the Board verbal and written updates asserting that Dr. Hodoh was connected to the attack, and she has repeated the accusation to administrators in her inner circle.

114. Upon information and belief, the Superintendent is also collecting written statements about Dr. Hodoh's role from Technology Department employees to support her termination. Those employees report to the Superintendent and Mr. Ruyan, whose own responsibility is at issue. The statements are being gathered after the fact, months after Dr. Hodoh's removal, by the official seeking her termination, the same pattern the Superintendent followed with Ms. Carter.

115. Superintendent Outley's accusations were false, and she knew it. She had overseen Information Technology since December 2025 and had ordered Dr. Hodoh locked out of District systems on May 8, 2026, and, as alleged in paragraphs 105 through 108, Dr. Hodoh never held endpoint-security access and the corrective actions belonged to others. The

assessment of the attack's cause was not complete and, upon information and belief, still has not been provided to the Board.

116. Upon information and belief, Superintendent Outley is seeking to terminate Dr. Hodoh's employment by December 31, 2026, on the basis of the Roetzel investigation and the cyberattack, both of which are pretexts for retaliation.

117. Upon information and belief, the Superintendent is using a District vendor to tie Dr. Hodoh to an attack on systems she could not access, the latest in the series of pretexts described above.

**J. Harm to Dr. Hodoh**

118. As a direct result, Dr. Hodoh has lost compensation paid to comparable white male administrators; has been removed from her workplace, staff, and functions; has suffered injury to her professional reputation; and has suffered emotional distress, anxiety, humiliation, and fear for her job.

## CLAIMS FOR RELIEF

119. Where any of the following claims are inconsistent, they are pleaded in the alternative. Fed. R. Civ. P. 8(d)(2)–(3).

## COUNT I
## RETALIATION
*Title VII, 42 U.S.C. § 2000e-3(a)*
**(Against Defendant Board of Education of the Akron City School District)**

120. Dr. Hodoh incorporates paragraphs 1 through 118.

121. Dr. Hodoh engaged in protected activity, including filing and amending her charge; telling the Superintendent of it on February 3, 2025; objecting in writing to retaliation on November 15, 2025 and March 23, 2026; invoking Title VII in her February 24, 2026 letter about her subpoenaed testimony; her March 27, 2026 sworn testimony supporting a Black employee's substantiated hostile-work-environment complaints; and her May 3 and May 4, 2026 notices.

122. The District knew of this activity, which it admits receiving or which was addressed to the Superintendent, Mr. Canfield, or the Board.

123. The District then took the materially adverse actions described in Sections D through I, including leaving her pay request unanswered, stripping her access and tools, bypassing her with her own staff, warning her for complaining, placing her on leave, commissioning an investigation of her by its litigation counsel, and, upon information and belief, pursuing her termination. Each action, and all of them together, well might have dissuaded a reasonable worker from making or supporting a charge.

124. Her protected activity was a but-for cause of these actions, as shown by Superintendent Robinson's unpopularity statement; the close timing; the Superintendent's solicitation of a statement against her after the May 3 notice; the month of inaction on the accounts later relied on; the departure from the ordinary pay process; the shifting explanations; the use of defense counsel and after-the-fact employee statements to build a justification; and the concealment of the leave from the EEOC. The District's stated reasons are pretext.

125. As a direct and proximate result, Dr. Hodoh has suffered lost compensation, loss of professional standing and opportunity, reputational harm, and emotional distress.

**COUNT II**
**RACE DISCRIMINATION, INCLUDING UNEQUAL PAY**
*Title VII, 42 U.S.C. § 2000e-2(a)(1)*
**(Against Defendant Board of Education of the Akron City School District)**

126. Dr. Hodoh incorporates paragraphs 1 through 118.

127. Dr. Hodoh is Black and was qualified for, and performed, both executive roles she held.

128. The District treated her less favorably than similarly situated white employees with respect to the terms, conditions, and privileges of her employment, including by: denying her the supplemental and extended pay it awarded to Steven Keenan and Thomas Bruno for additional duties; assigning her, without additional pay, the executive department her white male predecessor, Zachary Hanshaw, had led as a salaried, full-time role; seizing building access that

her white male predecessor held throughout his tenure; and abandoning the investigation of her complaint while completing an outside investigation of complaints by white male administrators.

129. The District took these actions because of Dr. Hodoh's race, or her race was at least a motivating factor, and they left her worse off in identifiable terms and conditions of employment. Its stated reasons are pretext. 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(m); *Muldrow*, 601 U.S. at 355.

130. As a direct and proximate result, Dr. Hodoh has suffered lost compensation, reputational harm, and emotional distress.

**COUNT III**
**SEX DISCRIMINATION, INCLUDING UNEQUAL PAY**
*Title VII, 42 U.S.C. § 2000e-2(a)(1)*
**(Against Defendant Board of Education of the Akron City School District)**

131. Dr. Hodoh incorporates paragraphs 1 through 118.

132. Dr. Hodoh is a woman and was qualified for, and performed, both executive roles she held.

133. For the reasons alleged in Count II, the District treated her less favorably than similarly situated male employees, including Mr. Keenan, Mr. Bruno, Mr. Hanshaw, and her male predecessor in Communications, with respect to her compensation and the terms, conditions, and privileges of her employment.

134. The District took these actions because of Dr. Hodoh's sex, or her sex was at least a motivating factor, and they left her worse off in identifiable terms and conditions of employment. Its stated reasons are pretext. 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(m).

135. As a direct and proximate result, Dr. Hodoh has suffered lost compensation, reputational harm, and emotional distress.

**COUNT IV**
**HARASSMENT AND HOSTILE WORK ENVIRONMENT BASED ON RACE AND SEX**
*Title VII, 42 U.S.C. § 2000e-2(a)(1)*
**(Against Defendant Board of Education of the Akron City School District)**

136. Dr. Hodoh incorporates paragraphs 1 through 118.

137. Because of her race and sex, Dr. Hodoh was subjected to unwelcome conduct: a Board member's order that she stay in her place; his physical confrontation of her in an elevator, which ended only when others intervened; and a continuing course of exclusion and scrutiny that stripped her of the tools, access, and authority her white male predecessor had kept.

138. That course of conduct, described in Sections B through G, included Board members' interference in her work and the leak of her complaint to the media, the Chapman complaint, the off-duty inquiry, the removal of her access, tools, and master key, and her removal from the workplace. Facially neutral conduct counts when part of a pattern, and the environment is judged as a whole. *Williams v. Gen. Motors Corp.*, 187 F.3d 553 (6th Cir. 1999).

139. The conduct was severe or pervasive enough to alter the conditions of her employment and create an abusive environment, she perceived it as such, and it caused her some harm respecting identifiable terms and conditions of employment. *McNeal v. City of Blue Ash*, 117 F.4th 887, 904 (6th Cir. 2024).

140. The District is liable: the harassment came from a Board member and from leadership with authority over her, and the District knew of it from her written reports but took no prompt corrective action. Upon information and belief, it also ignored the recommendations of two 2025 outside investigations that found bullying, harassment, or unwelcome conduct by District leadership.

141. As a direct and proximate result, Dr. Hodoh has suffered emotional distress, humiliation, and reputational harm.

**COUNT V**
**RETALIATORY HARASSMENT**
*Title VII, 42 U.S.C. § 2000e-3(a)*
**(Against Defendant Board of Education of the Akron City School District)**

142. Dr. Hodoh incorporates paragraphs 1 through 118.

143. Because of the protected activity described in Count I, the District subjected Dr. Hodoh to the sustained harassment described in Sections B and E through I, including the media leak of her complaint, the silent removal of her access, tools, and master key, meetings with her

staff to bypass her, a warning for complaining, her removal and isolation, and an investigation by its own litigation counsel run while the EEOC investigation was pending.

144. This retaliatory harassment was severe or pervasive, *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000), and well might have dissuaded a reasonable worker from making or supporting a charge of discrimination, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

145. The Superintendent and the Executive Director of Human Resources, who had authority over Dr. Hodoh's employment, carried out or directed the harassment, and the District knew of it from her repeated written complaints and did not stop it.

146. As a direct and proximate result, Dr. Hodoh has suffered emotional distress, humiliation, reputational harm, and the loss of the functions of her position.

**COUNT VI**
**AGE DISCRIMINATION IN COMPENSATION**
*ADEA, 29 U.S.C. § 623(a)(1)*
**(Against Defendant Board of Education of the Akron City School District)**

147. Dr. Hodoh incorporates paragraphs 1 through 118.

148. Dr. Hodoh is over forty years of age and within the class protected by 29 U.S.C. § 631(a). She was qualified for, and performed, the interim executive role for which she requested supplemental and extended pay.

149. The District paid Steven Keenan, approximately nineteen years younger than Dr. Hodoh, supplemental pay for interim supervisory duties, and paid Zachary Hanshaw, upon information and belief approximately twenty-six years younger, a full executive salary to lead the Information Technology department. It paid Dr. Hodoh nothing for ten months of greater additional duties, including leading that same department.

150. But for Dr. Hodoh's age, the District would not have denied her that compensation. Its stated reasons are contradicted by its own records and are pretext.

151. The violation was willful: the District knew of her written request and its own Board-approved pay to the younger comparators, yet told the EEOC she did not want the pay. Dr. Hodoh is entitled to liquidated damages. 29 U.S.C. § 626(b).

**COUNT VII**
**RETALIATION**
*ADEA, 29 U.S.C. § 623(d)*
**(Against Defendant Board of Education of the Akron City School District)**

152. Dr. Hodoh incorporates paragraphs 1 through 118.

153. Dr. Hodoh engaged in ADEA-protected activity when, in her amended charge first submitted on January 14, 2026, she first complained that the District had denied her pay because of her age, and when she pursued that charge.

154. The District acknowledges receiving the amended charge on April 20, 2026. Eighteen days later it removed her from the workplace, and it then commissioned an investigation of her by its litigation counsel.

155. These actions well might have dissuaded a reasonable worker from making or supporting a charge of age discrimination. Dr. Hodoh's protected activity was a but-for cause of its actions.

156. The District's violation was willful, entitling Dr. Hodoh to liquidated damages and to such legal and equitable relief as will effectuate the purposes of the ADEA. 29 U.S.C. § 626(b).

**COUNT VIII**
**RACE, SEX, AND AGE DISCRIMINATION, HARASSMENT, AND RETALIATION**
*Ohio Civil Rights Act, R.C. 4112.02(A), 4112.02(I), and 4112.052*
**(Against Defendant Board of Education of the Akron City School District)**

157. Dr. Hodoh incorporates paragraphs 1 through 118.

158. The District is an employer, and Dr. Hodoh is an employee, within the meaning of R.C. Chapter 4112. Dr. Hodoh is Black, a woman, and over forty years of age.

159. R.C. 4112.02(A) makes it unlawful for an employer, because of race, sex, or age, to discriminate against any person with respect to compensation or any matter directly or indirectly related to employment.

160. For the reasons alleged in Counts II, III, IV, and VI, the District discriminated against Dr. Hodoh because of her race, sex, and age, including by denying her the compensation it paid to comparable white, male, and substantially younger administrators, and by subjecting her to harassment that created a hostile work environment. For the reasons alleged in Counts I, V, and VII, the District also retaliated against Dr. Hodoh because she opposed unlawful discriminatory practices and made a charge under R.C. Chapter 4112, in violation of R.C. 4112.02(I).

161. Dr. Hodoh has satisfied the prerequisites of R.C. 4112.052(B). She filed a charge with the OCRC, dual-filed with the EEOC, and the EEOC issued a notice of her right to sue. This action is timely under R.C. 4112.052(C).

162. As a direct and proximate result, Dr. Hodoh has suffered lost compensation, emotional distress, humiliation, and injury to her professional reputation, and she is entitled to relief under R.C. 4112.052.

**COUNT IX**
**FIRST AMENDMENT RETALIATION**
*42 U.S.C. § 1983*
**(Against Defendant Mary B. Outley, in her individual capacity)**

163. Dr. Hodoh incorporates paragraphs 1 through 118.

164. On March 27, 2026, Dr. Hodoh gave truthful sworn testimony under subpoena in a District termination hearing, outside her ordinary job duties. Such testimony is citizen speech on a matter of public concern. *Lane v. Franks*, 573 U.S. 228 (2014).

165. On May 6, 2026, Dr. Hodoh reported to the full Board that a District executive's public explanation for damage to two schools was false and that the District had wasted public funds by ignoring its consultant's recommendations. School safety and public money are matters

of public concern, and reporting another executive to the Board was not among her ordinary duties.

166. Superintendent Outley knew of this speech: she was copied on Dr. Hodoh's February 24, 2026 letter about the subpoena and was a direct addressee of the May 6, 2026 report.

167. Dr. Hodoh's interest in this speech outweighed any interest of the District in the efficient delivery of public services: her testimony was compelled by law, and her report was made to the District's own governing body.

168. Acting under color of state law, Superintendent Outley took actions that would deter a person of ordinary firmness from speaking: she placed Dr. Hodoh on administrative leave 42 days after the testimony and two days after the May 6 report, commissioned an investigation of her by the District's litigation counsel, and, upon information and belief, is using the Roetzel investigation and the cyberattack to seek her termination.

169. Dr. Hodoh's protected speech was a substantial or motivating factor in those actions, as shown by the timing, the Superintendent's solicitation of a statement against her days before the leave, the month of inaction on the accounts later relied on, and the shifting reasons given for the leave.

170. The right of a public employee not to be retaliated against for truthful sworn testimony given under subpoena was clearly established by *Lane v. Franks* in 2014. Any reasonable official would have known that removing an employee from the workplace because of that testimony violated the First Amendment.

171. Superintendent Outley acted with malice or reckless indifference to Dr. Hodoh's federally protected rights, entitling Dr. Hodoh to punitive damages. *Smith v. Wade*, 461 U.S. 30 (1983).

172. As a direct and proximate result, Dr. Hodoh has suffered loss of professional standing and opportunity, reputational harm, and emotional distress.

**COUNT X**
**DEFAMATION (SLANDER AND LIBEL)**
*Ohio common law*
**(Against Defendant Mary B. Outley, in her individual capacity)**

173. Dr. Hodoh incorporates paragraphs 1 through 118.

174. Upon information and belief, on or about October 5, 2026, Superintendent Outley told members of the Board that Dr. Hodoh was responsible for the June 2026 cyberattack and had been intentionally negligent in managing the District's Information Technology function.

175. Those were statements of fact about Dr. Hodoh's conduct, capable of being proven true or false, and they were false.

176. Upon information and belief, Superintendent Outley has repeated those statements, orally and in writing, to Board President Sykes and the Board, and also to persons with no role in any Board deliberation: administrators in her inner circle and, through Mr. Canfield, administrators and Technology Department staff.

177. The statements are defamatory per se: they accuse Dr. Hodoh of misconduct and incompetence in her profession and tend to injure her in it.

178. Superintendent Outley made the statements with actual malice, knowing them to be false or with reckless disregard for their truth, as alleged in paragraphs 105 through 117. Any qualified privilege for statements to the Board was abused and lost.

179. Superintendent Outley acted with malicious purpose, in bad faith, or in a wanton or reckless manner, and she is therefore not immune from liability. R.C. 2744.03(A)(6)(b). She made the statements while Dr. Hodoh's discrimination charge was pending and in order to manufacture a basis for terminating Dr. Hodoh's employment.

180. As a direct and proximate result, Dr. Hodoh has suffered injury to her professional reputation, humiliation, emotional distress, and the threatened loss of her employment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Stacey D. Hodoh respectfully asks the Court to enter judgment in her favor and against Defendants Board of Education of the Akron City School District (the "District") and Mary B. Outley, and to:

A. Declare that the District violated Title VII of the Civil Rights Act of 1964 by discriminating against Dr. Hodoh because of her race and sex, by subjecting her to harassment and a hostile work environment, and by retaliating against her, and violated the Age Discrimination in Employment Act by discriminating against her in compensation because of her age and by retaliating against her; violated the Ohio Civil Rights Act, R.C. 4112.02(A), by discriminating against her because of her race, sex, and age, and R.C. 4112.02(I), by retaliating against her; and that Defendant Outley violated Dr. Hodoh's rights under the First Amendment;

B. Order the District to end the administrative leave and restore Dr. Hodoh to her position with its full duties, authority, staff, building access, and systems access, including public-records distribution, and to provide her BoardDocs access;

C. Enjoin the Defendants from further retaliation, including any discipline, non-renewal, or termination based on the post-leave investigation, the cyberattack, or her protected activity;

D. Order the District to remove from Dr. Hodoh's personnel file all records of the May 8, 2026 administrative leave, the investigation that followed it, and any related findings;

E. Award back pay, including the supplemental and extended compensation denied to her, with lost benefits and prejudgment interest;

F. Award front pay in lieu of reinstatement if reinstatement is found impracticable;

G. Award compensatory damages under 42 U.S.C. § 1981a on the Title VII claims;

H. Award liquidated damages under 29 U.S.C. § 626(b) for willful ADEA violations;

I. Award back pay and compensatory damages under R.C. 4112.052 on Count VIII;

J. Award attorney's fees and costs under 42 U.S.C. § 2000e-5(k) and 29 U.S.C. § 626(b);

K. Award compensatory and punitive damages against Defendant Outley, in her individual capacity, on Count IX;

L. Award compensatory and punitive damages against Defendant Outley, in her individual capacity, on Count X, subject to R.C. 2315.21;

M. Award reasonable attorney's fees and costs on Count IX under 42 U.S.C. § 1988;

N. Award post-judgment interest; and

O. Grant such other relief as the Court finds just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable. Fed. R. Civ. P. 38(b).

Dated: November 12, 2026

Respectfully submitted,

Dr. Stacey D. Hodoh, Plaintiff, *pro se*
1303 Hardesty Boulevard
Akron, Ohio 44320
Telephone: (404) 599-4578
Email: sdhodoh@gmail.com

**EXHIBITS**

Exhibit A — OCRC/EEOC Charge of Discrimination, filed December 26, 2024
Exhibit B — EEOC Determination and Notice of Rights, issued August 13, 2026